**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Hy Cite Corporation, a Wisconsin corporation,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>badbusinessbureau.com, L.L.C., a St. Kitts/Nevis Corporation d/b/a badbusinessbureau.com and/or ripoffreport.com and/or badbusinessbureau.com/Rip-Off Report.com;<br><br>Xcentric Ventures, L.L.C., an Arizona limited liability company d/b/a badbusinessbureau.com and/or ripoffreport.com and/or badbusinessbureau.com/Rip-Off Report.com; and<br><br>Ed Magedson, an Arizona resident,<br><br>　　　　Defendants. | No. CIV 04-2856-PHX-EHC<br><br>**ORDER** |

Defendant Xcentric Ventures, L.L.C. filed a Motion to Dismiss. [Dkt. 19]. Defendant Ed Magedson filed a Motion to Dismiss [Dkt. 38]. Those Motions are fully briefed.

Defendants Ed Magedson and Xcentric Ventures filed a Motion for Partial Reconsideration. [Dkt. 25]. Pursuant to the Court's Order [Dkt. 26], Plaintiff filed a Response [Dkt. 31] and Defendants filed a Reply [Dkt. 34].

//

**Facts Alleged in Plaintiff's Amended Complaint**

Defendant Ed Magedson manages Defendant Xcentric Ventures (Defendants). Defendants operate a website known as the Rip-off Report.[1] The website proclaims itself as "a worldwide consumer reporting Website & Publication, by consumers, for consumers, to file & document complaints about Companies or Individuals who ripoff consumers." [Dkt. 7, ex. A, p. 1]. The website claims to contain reports on "over 1,000 different Topics & Categories." [Dkt, 7, ex. A, p. 1]. The website allows users to post and view complaints, so called "Rip-off Reports," about businesses. Website users may also post comments or suggestions on complaints other users have posted. The website instructs its users that complaints may be used as negotiating tools with businesses. Specifically, the website states that a user may file a Rip-off Report detailing a complaint with a business, provide the business with notice of the Rip-off Report and advise the business that the user will update the Rip-off Report to include positive information about the business if the business resolves the user's complaint. [Dkt. 7, ex. A, p. 4]. The website states that media attention may follow the filing of a Rip-off Report. The website gives lawyers and potential plaintiffs instructions concerning how to use the information on the website to organize and file class action lawsuits. [Dkt. 7, ex. A, pp. 2, 4-5].

Defendants encourage users who want to do more than simply post complaints to become "Rip-off Reporters." A Rip-off Reporter answers the public's "need [for] heroes and heroines, who w[ill] expose bad business and get them to clean up their act." [Dkt. 7, ex. C, p. 1]. Defendants outline the questions a Rip-off Reporter should investigate, and invite Rip-off Reporters to contact Defendants with questions about investigating businesses. Rip-off Reporters are also encouraged to provide their names when posting on the website, which is otherwise done anonymously. Rip-off Reporters are not normally compensated, but according to Defendants' website "once we see your work over a period

---

[1] The Rip-Off Report website is located at the domain names www.ripoffreport.com and www.badbusinessbureau.com.

- 2 -

of time, we fee (sic) [words missing in original] honest and dedicated, and depending on the region you're in you will be considered for compensation." [Dkt. 7, ex. C, p. 2]. The website includes a tab containing information for those who wish to volunteer for the Rip-off Report.

According to Plaintiff's Amended Complaint, Defendants contribute material to the website. [Dkt. 7, pp. 6-7]. Defendants "produce original content contained in the Rip-Off Reports."[2] [Dkt. 7, p. 6]. Defendants produce editorials and create titles to the Rip-off Reports posted by users of the website. Defendants exercise editorial control over the website. Defendants use the website to solicit donations and sell the book, "Rip-Off Report.com Do-It-Yourself Guide: How to get Rip-off Revenge."

Plaintiff sells dinnerware and cookware under the trademarked name "Royal Prestige." On November 17, 2004, the Rip-off Report website included 35 Rip-off Reports involving Royal Prestige. Those reports detail various complaints about Plaintiff's business, including their sales tactics, misleading promotional offers, the quality of the dinnerware and cookware, and Plaintiff's refusal to abide by the terms of its sales contracts. [Dkt. 7, ex. G]. Plaintiff alleges that those reports contain "negative, false, misleading, and defamatory statements." For example, the website contains the statements: "Royal Prestige- Hy-Cite (sic) Liars, Thieves, Criminals;" "Hy-Cite (sic) was fined by several AGS around the country for their former scare tactics of telling people they would DIE if they cooked in any other cookware;" "Royal Prestige ripoff Contract is not valid for cancelation (sic)... I realized this was a crooked company;" and "Royal Prestige- Hy Cite Corporation ripoff and deceitful sales tactics." [Dkt. 7, p. 11].

Concerned with the complaints and statements appearing on the Rip-off Report website, Plaintiff, through counsel, sent letters to the website on April 16, 2003 and April

---

[2] Plaintiff does not describe specifically what original content Defendants produced. The exhibits attached to the Amended Complaint contain an Internet posting claiming that Defendant Magedson posted a complaint on the Rip-off Report website using another person's name and address. [Dkt. 7, ex. K, p. 4].

- 3 -

1  30, 2003, informing Defendants that they were publishing defamatory material and misusing
2  Plaintiff's trademark. [Dkt. 7, p. 11]. On April 17, 2003 and May 28, 2003, Defendants'
3  website, through counsel, responded in letters, directing Plaintiff to a mediation "program
4  by which it has assisted several companies in resolving complaints and has posted reports
5  on the website praising the companies for their cooperation and excellent customer
6  service." [Dkt. 7, ex. I, p. 1]. The letter instructed Plaintiff that if it was interested in the
7  program, it should send a e-mail to the editor of the Rip-off Report website. Plaintiff did so.
8        On July 11, 2003, after Plaintiff and Defendant Magedson had exchanged a series
9  of e-mails, Defendant Magedson described the mediation program and its cost. Under the
10 program, Defendants would e-mail "all the consumers who feel they were victimized,
11 stating that they will get a full refund plus a min[imum] of 5% more for their inconvenience
12 explaining (something to the effect of) management did not realize this was going on, and
13 they are glad (as we discussed by phone) that these Rip-off Reports were there to let them
14 know of the problems." [Dkt. 7, ex. J, p. 1 (parenthetical statements in original)]. Once a
15 user's complaint reported in a Rip-off Report was resolved, Defendants would update the
16 Rip-off Report and its title to show the complaint was resolved. If a user did not respond
17 to Defendants' e-mail, Defendants would update the Report to "reflect Hy Cites (sic)
18 willingness to satisfy this customer, but apparently they either filed a bogus Report, or
19 they are a disgruntled employee, a competitor (sic) etc, what ever (sic) our findings, with
20 some assistance from you, as to the possibilities of why they did not respond, the Report
21 will reflect that and will definitely put you in a good light" [Dkt. 7, ex. J, p. 2]. Defendants
22 would add to each Rip-off Report a link to a statement, written by Plaintiff, explaining the
23 steps it took to resolve the complaint.
24       Before Defendants would e-mail the users who filed Rip-off Reports, Plaintiff would
25 have to send a $30,000 check. Plaintiff would also have to provide Defendants with a
26 statement explaining the reasons for the complaints. Defendants would then "evaluate
27 your statement, to see if we can work with it to make this program work." [Dkt. 7, ex. J, p.
28

- 4 -

2]. Once all the Reports were updated, Plaintiff would be required to provide another $20,000. Thereafter, Plaintiff would be required to pay a $1,500 monthly retainer, in exchange for Defendant notifying Plaintiff of any complaints, as long as there were no more than four per month, and giving Plaintiff an opportunity to resolve the complaints before allowing any new Rip-off Reports against Plaintiff to be posted. [Dkt. 7, ex. J, p. 3].

**Procedural History**

On January 18, 2005, Plaintiff filed an Amended Complaint, alleging ten counts. [Dkt. 7]. The Amended Complaint names badbusinessbureau.com, L.L.C., Xcentric Ventures, L.L.C. and Ed Magedson as Defendants. The docket indicates that badbusinessbureau.com, L.L.C. has not been served and has not entered an appearance in this case.

On March 13, 2005, Plaintiff filed a Motion for Alternative Service on Defendant Magedson. [Dkt. 13]. Plaintiff alleged that it had unsuccessfully attempted to serve Defendant Magedson at his last known residence and had watched his post office box from February 16, 2005 to March 9, 2005, but had not seen Defendant Magedson. Plaintiff did not allege that it had sent a waiver of service request to Defendant Magedson's residence or his post office box. On April 19, 2005, the Court ordered Defense Counsel to accept service on Defendant Magedson's behalf and ordered Defendant Magedson to pay Plaintiff's costs incurred as a result of his avoidance of service. [Dkt. 24]. Defendant Magedson has been served [Dkt. 32], as has Defendant Xcentric Ventures [Dkt. 27].

*Motions to Dismiss*

Defendants Xcentric Ventures [Dkt. 19] and Magedson [Dkt. 38] filed Motions to Dismiss. Those Motions to Dismiss are entirely identical, with the exceptions that Defendant Magedson's Motion adds an argument that Plaintiff does not adequately plead wire fraud and discusses a recent Ninth Circuit decision, <u>Bosley Med. Inst., Inc. v. Kremer</u>, 403 F.3d 672 (9th Cir. 2005). Defendant Xcentric Ventures filed a Notice of Supplemental

1  Authority regarding Bosley Medical. [Dkt. 20]. The Court, therefore, will consider the
2  Motions together.
3  **Legal Standard**
4  A court may dismiss a complaint "only if it is clear that no relief could be granted
5  under any set of facts that could be proved consistent with the allegations." Swierkiewicz
6  v. Sorema N.A., 534 U.S. 506, 514 (2002) (citation omitted). All material allegations of the
7  complaint must be accepted as true and in a light most favorable to Plaintiff. In re
8  Broderbund/Learning Co. Securities Litigation, 294 F.3d 1201, 1203 (9th Cir. 2002).
9  **A.   Immunity Pursuant to the Communications Decency Act**
10  Defendants argue that Counts Three through Eight and Count Ten of Plaintiff's
11  Amended Complaint are barred by the Communications Decency Act (CDA), 47 U.S.C. §
12  230. The CDA provides that "no provider or user of an interactive computer service shall
13  be treated as the publisher or speaker of any information provided by another information
14  content provider." 47 U.S.C. § 230(c)(1). The phrase "interactive computer service is
15  defined as "any information service, system, or access software provider that provides or
16  enables computer access to the Internet and such systems operated or services offered by
17  libraries or educational institutions." 47 U.S.C. § 230 (f)(2). The phrase "information content
18  provider" is defined as "any person or entity that is responsible, in whole or in part, for the
19  creation or development of information provided through the Internet or any other
20  interactive computer service." 47 U.S.C. § 230 (f)(3).
21  In enacting the CDA, "Congress granted most Internet services immunity from
22  liability for publishing false or defamatory material so long as the information was provided
23  by another party. As a result, Internet publishers are treated differently from corresponding
24  publishers in print, television and radio." Carafano v. Metrosplash.com, Inc., 339 F.3d 1119,
25  1122 (9th Cir. 2003). Congress found Internet services and publishers deserving of this
26  favorable treatment because the Internet has flourished "with a minimum of government
27  regulation," and has become "a forum for a true diversity of political discourse, unique
28

opportunities for cultural development, and myriad avenues for intellectual activity." 47 U.S.C. § 230 (a)(4) & (5).

Based on Congress' findings, "reviewing courts have treated § 230(c) immunity as quite robust."[3] Carafano, 339 F.3d at 1123 (citing cases). The Ninth Circuit has issued two decisions addressing claims of § 230(c) immunity. Both of those cases turned on whether the defendants were "information content providers" of the allegedly wrongful content posted on their websites.

In Carafano, the Court held that the defendant, a computer match-making service, was immune from liability for false content in a dating profile posted on the defendant's website because the critical information was provided by a third party and the defendant transmitted the information without alteration. 339 F.3d at 1125. The information given in the dating profile was formulated in response to the defendant's questionnaire, which the defendant used to gather standarized information for the dating profiles it posted on its website. The Court concluded that soliciting data through a questionnaire did not constitute "a significant role in creating, developing or 'transforming' the relevant information." Ibid.

In another case, the Court considered whether § 230(c) immunity applied to the defendant operator of an electronic newsletter who published in the newsletter an allegedly defamatory e-mail sent to him by a third party. Batzel v. Smith, 333 F.3d 1018, 1021 (9th Cir. 2003). In that case, the Court found that the defendant's website and electronic newsletter fit "the broad statutory definition of 'interactive computer service.'" Id., 333 F.3d 1030. The Court stated that "the pertinent question is whether [the third party] was the sole content provider of his e-mail, or whether [the defendant] can also be considered to have

---

[3] A commentator has argued that § 230(c) immunity should be narrowly construed because in enacting the CDA Congress did not consider the potential harms to the subjects of false or defamatory material posted on the Internet. Susan Freiwald, Comparative Institutional Analysis in Cyberspace: The Case of Intermediary Liability for Defamation, 14 Harv. J.L. & Tech. 569, 631-42 (2001).

1 "creat[ed]" or "develop[ed]" [the third party's] e-mail message." Id., 333 F.3d at 1031. The
2 Court found that the defendant was not a content provider because he "did no more than
3 select and make minor alterations to [the third party's] e-mail." Ibid. The Court, however,
4 remanded the case to determine whether the allegedly defamatory e-mail was "provided by
5 another information content provider" because the sender of the e-mail maintained that he
6 did not send the e-mail intending it for publication on the Internet. Id., 333 F.3d at 1032.

7 Turning to this case, Defendants are alleged to be "provider[s]... of an interactive
8 computer service." See 47 U.S.C. § 230(c). Plaintiff alleges that Defendants operate a
9 website known as the Rip-off Report and that persons using the Internet have access to
10 the website. See 47 U.S.C. § 230(f)(2). Persons accessing the website may view so-called
11 Rip-off Reports, make comments on those Reports, or post their own Rip-off Reports. As
12 in Carafano and Batzel, the pertinent question is whether users posting on Defendants'
13 website are the sole providers of the allegedly wrongful content, or whether Defendants
14 can be considered to have created or developed any of the allegedly wrongful content
15 posted on the Rip-off Report website.

16 Defendants argue that they did not create or develop any of the allegedly wrongful
17 content, although they provided other content on the Rip-off Report website, because the
18 allegedly wrongful content appears in Rip-off Reports authored by users accessing the
19 website. This argument ignores Plaintiff's allegations that wrongful content appears on the
20 Rip-off Report website in editorial comments created by Defendants and titles to Rip-off
21 Reports, which Defendants allegedly provide. Moreover, Plaintiffs allege that Defendants
22 "produce original content contained in the Rip-off Reports." Plaintiffs further allege that
23 Defendants "solicit individuals to submit reports with the promise that individuals may
24 ultimately be compensated for their reports." These allegations arguably could support a
25 finding that Defendants are "responsible... for the creation or development of information"
26 provided by individuals submitting Rip-off Reports in response to Defendants' solicitation.

1 See 47 U.S.C. § 20(f)(3). Taking Plaintiff's allegations as true, In re Broderbund, 294 F.3d at 1203, Defendants are not entitled to immunity under the CDA at this stage of the case.

### B.    Racketeer Influenced and Corrupt Organizations Act (RICO)

Counts One and Two allege violations of RICO, which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). "Racketeering activity" includes extortion, both actual or threatened, and wire fraud. 18 U.S.C. § 1961(1)(A) & (B). To show a "pattern of racketeering activity" a plaintiff must show at least two racketeering acts. 18 U.S.C. § 1961(5), Sedima v. Imrex Co., 473 U.S. 479, 496, n. 14 (1985) ("while two acts are necessary, they may noy be sufficient"). Simply stated, "RICO prohibits engaging in a pattern of 'racketeering activity,' defined as violating certain laws; as such, a predicate illegal act must be alleged." Mendoza v. Zirkle Fruit Co., 301 F.3d 1163, 1168 (9th Cir. 2002) (citation omitted). In this case, Plaintiff alleges threatened extortion and wire fraud.

### 1.    Predicate Acts: Threatened Extortion and Wire Fraud

In defining extortion, the RICO statute refers to 18 U.S.C. § 1951, which in subsection (b)(2) defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear." Obtaining property by threatening economic loss can constitute extortion if the person making the threat does not have a right to the property. See, e.g., United States v. Katter, 840 F.2d 118, 122-24 (1st Cir. 1988) (threat to defame if money owed under a contract was not paid constituted extortion), United States v. Cerilli, 603 F.2d 415, 418-19 (3d Cir. 1979) (grant of government contracts conditioned on making political contributions was extortion), but see Rothman v. Vedder Park Mgmt., 912 F.2d 315, 318 (9th Cir. 1990) (no extortion where defendants threatened to raise rent because, as landlords, they had a right to raise rent). Here, Defendants argue that Plaintiff does not properly allege threatened

1 extortion because Defendants conduct, as alleged, is "nothing more than an offer to
2 provide services for compensation;" and thus there is no allegation of a wrongful threat
3 of economic loss. [Dkt. 38, p. 12].

4     In the Amended Complaint, Plaintiff alleges that Defendants solicit and create Rip-
5 off Reports with "negative, misleading, false, and defamatory content." [Dkt. 7, p. 2].
6 Plaintiff further alleges that Defendants will only remove or modify those wrongful reports
7 if paid a fee of $50,000 and a monthly retainer of $1,500. Stated in full, Plaintiff alleges that,
8 after receiving a $30,000 check, Defendants would contact users who filed Rip-off Reports
9 against Plaintiff with an offer that Plaintiff would refund their money paid to Plaintiff plus
10 five percent. Defendants would then update the Rip-off Report and its title to show that
11 the complaint was resolved. Plaintiff further alleges that if the author of a Rip-off Report
12 did not respond to Defendant's e-mail, Defendants would update the Report to "reflect Hy
13 Cites (sic) willingness to satisfy this customer, but apparently they either filed a bogus
14 Report, or they are a disgruntled employee, a competitor (sic) etc, what ever (sic) our
15 findings, with some assistance from you, as to the possibilities of why they did not
16 respond, the Report will reflect that and will definitely put you in a good light" [Dkt. 7, ex.
17 J, p. 2]. Plaintiff alleges that in exchange for the $30,000 check, Defendant would also
18 include a link to a statement, written by Plaintiff, explaining the steps it took to resolve the
19 complaint. Plaintiff alleges that it would be required to provide another $20,000 once all the
20 Rip-off Reports against Plaintiff were updated. Plaintiff further alleges that Defendants
21 would require Plaintiff to pay a $1,500 monthly retainer, in exchange for Defendant
22 notifying Plaintiff of any new complaints and giving Plaintiff an opportunity to resolve the
23 complaints before allowing any new Rip-off Reports against Plaintiff to be posted. [Dkt. 7,
24 ex. J, p. 3]. Plaintiff alleges that Defendants have threatened other businesses with this
25 scheme.

26     Those allegations of Defendants' conduct distinguishes this case from Rothman.
27 There, the defendants owned and operated a mobile home park. As landlords, the
28

defendants had the right to set the price of rent in the park. Because the defendants had the right to raise the rent, it was not unlawful for them to threaten raising the rent for tenants who refused to enter a lease agreement. Id., 912 F.2d at 318. Here, Defendants operate a website. Plaintiff alleges that Defendants create and solicit false and defamatory complaints against businesses, but will cease this conduct for a $50,000 fee and $1,500 monthly retainer. Remedying the publication of false and defamatory complaints, which Defendants allegedly created and solicited, does not give Defendants the right to collect fees. See Katter, 840 F.2d at 122-24 (RICO claim allowed where the defendant threatened defamation if not paid money, even though the plaintiff owed the defendant money under a contract). Plaintiff has properly alleged threatened extortion.

Plaintiff has also properly alleged wire fraud. Wire fraud occurs when a person "(1) devised or intending to devise any scheme or artifice... for obtaining money... by means of false or fraudulent pretenses, representations or promises, (2) transmits or causes to be transmitted by means of wire... any writings... for the purpose of executing such scheme or artifice." 18 U.S.C. § 1343 (numbers added). As discussed above, Plaintiff alleges that Defendants intentionally used their website as a scheme to obtain money from Plaintiff and other businesses by means of false and defamatory complaints created and solicited by Defendants. Plaintiff also alleges that Defendants posted false and defamatory complaints and sent e-mails requesting that Plaintiff pay a $50,000 fee and $1,500 monthly retainer before Defendants would take any action related to the materials on the website. Both posting complaints on the website and sending e-mails requires transmitting writings by means of wire. See United States v. Pirello, 255 F.3d 728, 729 (9th Cir. 2001) (affirming sentence imposed after the defendant "pled guilty to using the Internet to commit wire fraud in violation of 18 U.S.C. § 1343").

### 2. Injury Actionable under RICO

RICO provides a civil action for "any person injured in his business or property by reason of" a pattern of racketeering activity. 18 U.S.C. § 1964(c). Defendants argue that

1 Plaintiff has not alleged injury to business or property and that any injury alleged by
2 Plaintiff was caused by users of Defendants' website, not by Defendants' alleged
3 racketeering activity.

4       Plaintiff alleges that it has lost customers, that customers have rescinded sales
5 contracts, and that Plaintiff's reputation has been injured as a result of the contents of
6 Defendants' website. Plaintiff further alleges that users of Defendants' website have
7 expressly stated on the website that they withheld business from Plaintiff after viewing the
8 website. That allegation distinguishes this case from <u>Imagineering, Inc. v. Kiewit Pacific</u>
9 <u>Co.</u>, 976 F.2d 1303, 1309-12 (9th Cir. 1992), where the plaintiffs alleged only speculative
10 injuries, having failed to allege any specific bids they lost due to the defendants'
11 racketeering activity. In determining whether an injury is to "business or property" as
12 used in 18 U.S.C. § 1964(c), the Court will look to state law. See <u>Diaz v. Gates</u>, 420 F.3d 897,
13 899 (9th Cir. 2005) (en banc) (in the RICO context, "we typically look to state law to
14 determine whether a particular interest amounts to property"(quotation omitted)).
15 Interference with contractual relationships is actionable in Arizona, <u>Safeway Ins. Co. v.</u>
16 <u>Guerrero</u>, 106 P.3d 1020, 1025, __ Ariz. __ (2005) (insurance company did not have a claim
17 for interference with contract against attorney representing an opposing party in other
18 litigation), as is interference with a business relationship, <u>Antwerp Diamond Exch. v. Better</u>
19 <u>Business Bureau</u>, 637 P.2d 733, 740, 130 Ariz. 523, 529 (1981)(disapproved on unrelated
20 grounds in <u>Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.</u>, 472 U.S. 749, 753, n. 1
21 (1985)) ("dampening sales or other business transaction" was cognizable injury). Damage
22 to reputation is compensable under those causes of action. RESTATEMENT (SECOND)
23 OF TORTS, § 774A(1)(c) (1979). As alleged, Plaintiff's injuries are to their "business or
24 property."

25       Plaintiff's injuries, as alleged, were caused by Defendants racketeering activity.
26 Plaintiff alleges that Defendant intentionally used its website as a scheme to obtain money
27 from Plaintiff and other businesses. Plaintiff alleges that Defendants did so by creating and
28

1  soliciting content injurious to Plaintiff's business and offering to alter the content to
2  portray Plaintiff in a good light if Plaintiff payed a $50,000 fee and $1,500 monthly retainer.

**C.     The Lanham Act**

The Lanham Act, 15 U.S.C. §§ 1051 et seq., "is designed to protect consumers who have formed particular associations with a mark from buying a competing product using the same or substantially similar mark and to allow the mark holder to distinguish his product from that of his rivals." Bosley Med. Inst., Inc. v. Kremer, 403 F.3d 672, 676 (9th Cir. 2005). To state a Lanham Act claim, Plaintiff must allege that it has suffered a competitive injury. See Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co., 173 F.3d 725, 734 (9th Cir. 1999) (seeking to divert business from plaintiff to defendant was competitive injury alleged to support false advertising claim). In contradistinction, making a false representation for a purpose other than competition is not actionable under the Lanham Act, otherwise the Lanham Act would create a federal tort of misrepresentation. Bosley Medical, 403 F.3d at 679-80 (no Lanham Act claim because defendant's "use of the [plaintiff's] mark simply cannot mislead consumers into buying a competing product"), Halicki v. United Artists Communications, Inc., 812 F.2d 1213, 1214 (9th Cir. 1987) (no Lanham Act claim for false advertising where movie theaters advertised a movie rated R although it was actually rated PG).

In this case, Plaintiff alleges that the statements on Defendants' website concerning Plaintiff's dinnerware, cookware, and business practices constitute unfair competition, false advertising and disparagement (Counts Six through Eight) in violation of the Lanham Act. Plaintiff alleges that it suffered a competitive injury because those statements "are used to promote goods and services sold by Defendants." [Dkt. 7, p. 23]. The only goods of Defendants mentioned in the Amended Complaint are Defendants' book, "Rip-Off Report.com Do-It-Yourself Guide: How to get Rip-off Revenge." [Dkt. 7, p. 6]. The only services mentioned in the Amended Complaint are the mediation program- where

- 13 -

1  Defendants update the content of the Rip-Off Reports to portray businesses in a good
2  light- which Plaintiff alleges is an extortionate scheme. [Dkt. 7, p. 15].

3  The situation Plaintiff alleges differs from <u>Coastal Abstract</u>, 173 F.3d at 734, because
4  Plaintiff's business selling dinnerware and cookware cannot be diverted to Defendants,
5  whose business is criticizing other businesses. In <u>Coastal Abstract</u>, an officer of the
6  defendant title company argued that he could not be liable "under the Lanham Act because
7  he, as an individual, is not in competition with [the plaintiff] Coastal," an escrow agency.
8  <u>Ibid</u>. The Court found the defendant corporation's officer could be liable under the Lanham
9  Act because he "sought by his statements to divert business from [the plaintiff] Coastal
10 to [the defendant] First American," thereby causing plaintiff a competitive injury. <u>Ibid</u>. In
11 this case, Plaintiff's injuries as a result of Defendants' website are not competitive injuries
12 because sales of dinnerware and cookware cannot be diverted to sales of Defendants' book
13 or remediation program.

14 The situation alleged in this case is akin to that presented in <u>Bosley Medical</u>, 403
15 F.3d at 674, where the defendant created a website to publicize his complaints about the
16 plaintiff's business and to strengthen his negotiating position with the plaintiff. The
17 plaintiff in that case argued that its allegations of extortion and preventing "users from
18 obtaining the plaintiff's goods and services" sufficed under the Lanham Act. <u>Id.</u>, 403 F.3d
19 at 678-80. The Court held that the defendant's activities did not constitute actionable
20 conduct under the Lanham Act. Although Plaintiff in this case alleges Lanham Act claims
21 for unfair competition, false advertising and disparagement, while <u>Bosley Medical</u> involved
22 Lanham Act claims for trademark infringement and dilution, the holding in <u>Bosley Medical</u>
23 was not based on the particularities of those claims, but on the purposes of the Lanham
24 Act. The Court stated:

25 > The dangers that the Lanham Act was designed to address are simply not
26 > at issue in this case. The Lanham Act, expressly enacted to be applied in
27 > commercial contexts, does not prohibit all unauthorized uses of a
28 > trademark. [The defendant] Kremer's use of the [plaintiff's] Bosley Medical
   > mark simply cannot mislead consumers into buying a competing product -

- 14 -

> - no customer will mistakenly purchase a hair replacement service from Kremer under the belief that the service is being offered by [the plaintiff] Bosley. Neither is Kremer capitalizing on the good will Bosley has created in its mark. Any harm to Bosley arises not from a competitor's sale of a similar product under Bosley's mark, but from Kremer's criticism of their services. Bosley cannot use the Lanham Act either as a shield from Kremer's criticism, or as a sword to shut Kremer up.

Id., 403 F.3d at 679-80. Similarly, in this case no one will mistakenly purchase cookware or dinnerware from Defendants in the mistaken belief that it is Plaintiff's cookware or dinnerware. The criticism of Plaintiff's business appearing on Defendants' website is not a competitive injury actionable under the Lanham Act.

**D.    Common Law Trademark Infringement and Unfair Competition**

Defendants argue that Count Nine alleging common law trademark infringement and unfair competition must be dismissed because Plaintiff has not alleged that the appearance of Plaintiff's mark on Defendants' website is likely to cause confusion as to Plaintiff's relationship with the website. The "likelihood of confusion" standard is found in the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), and in common law unfair competition, see RESTATEMENT (THIRD) OF UNFAIR COMPETITION, § 2 (1995) ("likely to deceive or mislead"). Common law unfair competition, however, is broader than the Lanham Act because the common law imposes liability for a false or misleading representation that "is to the likely commercial detriment of another." RESTATEMENT (THIRD) OF UNFAIR COMPETITION, § 2. As previously mentioned, the Amended Complaint alleges that Defendants' website contains false and defamatory statements which have injured Plaintiff's business. Plaintiff has alleged common law unfair competition.

*Motion for Partial Reconsideration*

On April 19, 2005, the Court ordered alternative service on Defendant Magedson and ordered that "Defendant Magedson shall pay Plaintiff all costs and fees incurred as a result of Defendant Magedson's avoidance of Service of Process." [Dkt. 24, p. 2]. Defendants filed a Motion for Partial Reconsideration [Dkt. 25] of the portion of the Order requiring Defendant Magedson to pay Plaintiff's costs and fees.

- 15 -

1    "[A] motion for reconsideration should not be granted, absent highly unusual
2    circumstances, unless the district court is presented with newly discovered evidence,
3    committed clear error, or if there is an intervening change in the controlling law." 389
4    Orange Street Partners v. Arnold, 179 F.3d 656, 665 (9th Cir. 1999) (no clear error where
5    district court did not redesignate a cross-claim as an affirmative defense because party did
6    not raise the issue until after grant of summary judgment).

7    Defendants argue that Defendant Magedson should not be required to pay
8    Plaintiff's costs and fees incurred as a result of his avoidance of service of process because
9    Plaintiff did not send him a waiver of service pursuant to Fed. R. Civ. P. 4(d). The Federal
10   Rules of Civil Procedure impose a duty on certain defendants "to avoid unnecessary costs
11   of serving the summons." Fed. R. Civ. P. 4(d)(2). That duty is only imposed on a defendant
12   "that receives notice of an action in the manner provided in this paragraph," which is by
13   mailing a notice of the action and a "request that the defendant waive service of a
14   summons." Ibid. If a defendant fails to waive the service of a summons, "the court shall
15   impose the costs subsequently incurred in effecting service on the defendant unless good
16   cause for the failure be shown." Fed. R. Civ. P. 4(d).

17   Plaintiff does not argue that Defendant Magedson failed to waive the service of a
18   summons and that Plaintiff was awarded its costs and fees based on the failure to waive
19   service. Plaintiff argues the Court properly required Defendant Magedson to pay its costs
20   and fees as an exercise of the Court's inherent power to sanction parties to litigation.
21   Plaintiff further argues a sanction is proper in this case because Defendant Magedson
22   avoided service of process, indicating that a request for waiver of service would have been
23   futile.

24   Plaintiff fails to point to any authority- and the Court can find no authority- for the
25   proposition that the alleged futility of requesting a waiver of service justifies shifting the
26   costs and fees of the service of process. Neither is there any reason Plaintiff could not
27   have mailed a waiver of service request to Defendant Magedson. Plaintiff had Defendant
28

- 16 -

1 Magedson's post office box address, a proper address for sending a waiver of service
2 request. Compare Fed. R. Civ. P. 4(d)(2)(A) (waiver of service request "shall be addressed
3 directly to the defendant") with Fed. R. Civ. P. 4(e)(2) (summons and complaint shall be
4 served personally or "at the individual's dwelling house or usual place of abode"). Plaintiff
5 had Defendant Magedson's last known residential address. [Dkt. 17]. Defendant
6 Magedson represented that residential address on his application for a post office box,
7 which requires him to immediately update his residential address upon a change. Plaintiff
8 mailed the Summons, Complaint, and Court Order authorizing alternative service to that
9 residential address in satisfaction of Ariz. R. Civ. P. 4.1(m) (allowing alternative service, but
10 requiring summons and pleading to be sent to last known residence of the person to be
11 served). Because Plaintiff did not mail a waiver of service to Defendant Magedson as
12 required under Fed. R. Civ. P. 4(d), it was clear error to require Defendant Magedson to pay
13 Plaintiff's costs and fees incurred as a result of Defendant Magedson's avoidance of
14 service of process.

15 Accordingly,

16 **IT IS ORDERED** that Defendant Xcentric Ventures, L.L.C.'s Motion to Dismiss [Dkt.
17 19] is **GRANTED IN PART** and **DENIED IN PART**;

18 **IT IS FURTHER ORDERED** that Defendant Ed Magedson's Motion to Dismiss
19 [Dkt. 38] is **GRANTED IN PART** and **DENIED IN PART**;

20 **IT IS FURTHER ORDERED** that Counts Six, Seven and Eight of Plaintiff's Amended
21 Complaint are **DISMISSED** for failure to state a claim upon which relief can be granted.

22 **IT IS FURTHER ORDERED** that Defendant's Motion for Partial Reconsideration
23 [Dkt. 25] is **GRANTED**;

24 //
25 //
26 //
27 //
28

1   **IT IS FURTHER ORDERED** that Defendant Ed Magedson shall not be required to
2   pay Plaintiff all costs and fees incurred as a result of Defendant Ed Magedson's avoidance
3   of Service of Process.

4   DATED this 27th day of December, 2005.

*Earl H. Carroll*
Earl H. Carroll
United States District Judge